[Cite as *State ex rel. Ohio Valley Selective Harvesting, L.L.C. v. Buehrer*, 2017-Ohio-369.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. | : | |
| Ohio Valley Selective Harvesting, L.L.C. | | |
| and | : | |
| Peggy A. Lansing, | | |
| | : | |
| Relators, | | No. 16AP-5 |
| | : | |
| v. | | (REGULAR CALENDAR) |
| | : | |
| Stephen Buehrer, Administrator of the | | |
| Ohio Bureau of Workers' Compensation, | : | |
| | | |
| Respondent. | : | |

_____

D E C I S I O N

Rendered on January 31, 2017

_____

*Anthony A. Moralja*, for relators.

*Michael DeWine*, Attorney General, and *John R. Smart,* for respondent.

_____

IN MANDAMUS

BRUNNER, J.

{¶ 1} Relators Ohio Valley Selective Harvesting, L.L.C. ("OVSH") and Peggy A. Lansing have filed an original action requesting this Court issue a writ of mandamus ordering respondent, Stephen Buehrer, Administrator of the Ohio Bureau of Workers' Compensation ("BWC"), to vacate BWC's final order issued on November 30, 2015 finding that OVSH had underreported its payroll by not reporting its workers as employees, but claiming that they were independent contractors, and ordering BWC to issue a new order finding that OVSH's workers were independent contractors for purposes of reporting payroll.

No. 16AP-5

{¶ 2}   We referred this matter to a magistrate of this Court pursuant to Civ.R. 53(C) and Loc.R. 13(M) of the Tenth District Court of Appeals.  The magistrate issued the appended decision, including findings of fact and conclusions of law, recommending this Court deny relators' request for a writ of mandamus.

{¶ 3}   No objections have been filed to the magistrate's decision.

{¶ 4}   Having conducted an independent review of the record in this matter and finding no error of law or other defect on the face of the magistrate's decision, this Court adopts the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein.  In accordance with the magistrate's decision, we deny the requested writ of mandamus.

*Writ of mandamus denied.*

BROWN and SADLER, JJ., concur.

_____

No. 16AP-5

APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. | : | |
| Ohio Valley Selective Harvesting, L.L.C. | | |
| and | : | |
| Peggy A. Lansing, | | |
| | : | |
| Relators, | | No. 16AP-5 |
| | : | |
| v. | | (REGULAR CALENDAR) |
| | : | |
| Stephen Buehrer, Administrator of the | | |
| Ohio Bureau of Workers' Compensation, | : | |
| | | |
| Respondent. | : | |

MAGISTRATE'S DECISION

Rendered on August 17, 2016

*Anthony A. Moraleja,* for relators.

*Michael DeWine,* Attorney General, and *John R. Smart,* for respondent.

IN MANDAMUS

{¶ 5} Relators, Ohio Valley Selective Harvesting, L.L.C. ("OVSH") and Peggy A. Lansing ("Lansing"), filed this original action requesting that this court issue a writ of mandamus ordering respondent, Ohio Bureau of Workers' Compensation ("BWC"), to vacate its order finding that OVSH had underreported its payroll by not reporting its workers as employees but claiming that they were independent contractors, and ordering the BWC to issue a new order finding that OVSH's workers were independent contractors for purposes of reporting payroll.

No. 16AP-5

Findings of Fact:

{¶ 6}   1. OVSH is involved in the business of cutting trees and hauling away the cut logs.

{¶ 7}   2. On May 8, 2012, Peggy A. Cooper (kna Peggy Lansing), doing business as OVSH, signed an application for workers' compensation coverage.  In that application, Lansing identified herself as the owner of the company, indicated that the machinery, equipment, and tools necessary included a skidder, loader, and chain saws, that the operation type for purposes of payroll was cutting timber.  As a sole proprietor, Lansing did not elect coverage for herself and further claimed she had no employees, and no payroll.  Coverage was effective May 9, 2012.

{¶ 8}   3. In April 2014, Kelly Smith filed a First Report of an Injury, Occupational Disease or Death ("FROI"), asserting that, while employed by OVSH, he sustained a work-related injury when a tree he was cutting down fell on his leg.  In his application, Smith indicated that he was hired July 28, 2010.

{¶ 9}   4. In a memorandum dated May 16, 2014, Jason Price of the BWC's Special Investigations Unit ("SIU") summarized his review of Smith's claim.  Price's memo provides, in pertinent part:

> The attorney for the EOR, Tony Moraleja contacted SMITH'S assigned Claim Service Specialist (CSS) and notified BWC that SMITH was terminated from Employment on April 22, 2014, the day before the alleged industrial injury.
>
> A review of SMITH'S claim 14-819572 revealed a First Report of Injury (FROI signed and dated by Smith on April 25, 2014, when SMITH was cutting down a tree that fell on him. The date of injury and the last date worked are both listed as April 23, 2014. * * *
>
> On May 14, 2014, Special Agent Jason Price (Agent Price) conducted an interview with Ohio Valley Selective Harvesting business owner, Peggy Lansing (Lansing). Lansing advised that on April 22, 2014, SMITH arrived to work and demanded her husband, Brad Lansing (Brad) drive SMITH to a trailer park so he could obtain a pain pill, which Brad refused. During lunch that same day, SMITH again requested Brad drive him into town so he could obtain a pain

No. 16AP-5

> pill. Brad refused again, and notified Lansing of the events. At the end of the work day, Lansing met SMITH and the other employees at the business * * *. Lansing advised she terminated SMITH'S employment with several witnesses in the area.
>
> Lansing further stated that on April 23, 2014, SMITH showed up to a job site without permission. SMITH took a chain saw from his nephew, Jake Smith, proceeded down into the brush, and began alleging that a tree fell on him and he was hurt. Lansing was notified of the events and proceeded to the job site. When Lansing arrived on site, SMITH was walking around. Lansing stated she informed SMITH that she was there to take him to the hospital. SMITH denied being in any pain and refused to go to the hospital. Lansing advised she dropped SMITH off at his mother's residence.

(Emphasis sic.)

{¶ 10} 5. Following Smith's claim, the BWC initiated an audit of OVSH's business and requested specific documentation from Lansing. Among the documents provided was the 2013 tax return for OVSH indicating wages of $67,612, specific business expenses which included work clothes, employee fines, cell phones and supplies, employee drug tests, and membership fees to the BWC. Lansing also provided a blank unsigned copy of a contractor and subcontractor agreement and a certain amount of worker payment information.

{¶ 11} 6. The auditor made the following findings:

> The risk issued 1099's for all individuals that worked for the employer. In 2012 they did have two that worked as drivers however the[y] also worked performing the other functions as well (cutting trees, operating skidders & loaders). There was no segregation. The risk did provide a[n] unsigned contract. However it does not address terms of work. The risk owns all equipment the contractors use. The employer made verbal agreements on what they would pay individuals to perform any work. There is [sic] no invoices or any other document to support independence. Per tax return showed the employer was [sic] expenses for work clothes, license tags, cell phone & supplies, employees fines & drug test. These are the actual titles on the tax return deductions section.

No. 16AP-5

{¶ 12} The auditor also noted that he was still awaiting additional information from OVSH including 1099s, the 2012 Federal Tax Return, and all signed contracts for the 1099s issued in 2012 and 2013.

{¶ 13} 7. The BWC found that OVSH had failed to report its payroll and failed to pay workers' compensation premiums from May 2012 to December 2013 and noted that the determination was based on the limited information provided by Lansing.

{¶ 14} 8. OVSH was sent an invoice dated December 15, 2014 in the amount of $67,688.07.

{¶ 15} 9. In a letter dated January 8, 2015, OVSH disputed the audit findings, stating:

> This notice to inform the Bureau of Worker's [sic] Compensation that my office represents Peggy Cooper, aka Peggy Lansing, and Ohio Valley Selective Harvesting regarding the invoice she received on December 15, 2014. Ohio Valley Selective Harvesting pays subcontractors with a 1099, they do not have a payroll of employees. The company is a lumbering business with sporadic/seasonal work and therefore can only hire on a job-by-job basis. Depending on the extent of each individual timbering contract, the company decides on the number of subcontractors necessary. The number varies from job to job. My client would like to dispute the invoice that she received and have this matter further reviewed. Please advise my office of the next course of action would be [sic].

{¶ 16} 10. In a letter dated January 22, 2015, the BWC notified OVSH that its protest had been denied, stating:

> Your complaint received on 1/15/15 protesting audit findings for the period covering 5/9/12 — 12/31/13 has undergone a departmental review. Regrettably, the BWC has denied your request and the audit findings have been affirmed.
>
> The requirements for being an independent contractor are found in Ohio Revised Code Section 4123.01. BWC uses a factor test to determine employee/employer relationships. Because the following conditions apply: There was no information to support that the individuals were true independent contractors. We have determined that there was

No. 16AP-5

> an employee/employer relationship with all 1099's that were issued by the company for 2012 & 2013.
>
> You may appeal BWC's decision pursuant to Ohio Revised Code Section 4123.291 and Ohio Administrative Code Section 4123-14-06. If you have any questions regarding this matter, please call me.

{¶ 17} 11. Lansing requested a hearing before the BWC adjudicating committee and that hearing was held on May 5, 2015. Within the findings of fact section of the adjudicating committee's order are the following facts which related to the claim submitted by Smith in April 2014:

> [Five] On May 16, 2014, Jason Price, BWC Special investigations Unit (SIU), submitted a memorandum in claim 14-819572, which contains certain relevant information as follows:
>
> a. The attorney for the employer, Tony Moraleja contacted Smith's CSS and told BWC "that SMITH was terminated from employment on April 22, 2014, the day before the alleged industrial industry."
>
> b. An Interview Statement signed by Peggy Lansing on May 14, 2014, wherein she states that after Mr. Smith asked her husband to take him into town to get a pain pill, she "fired Smith on the spot and wrote him his final paycheck on the 22nd." (Reference is to April 22, 2014.)
>
> [Six] The claim filed by Kelly Smith was denied by BWC on May 20, 2014. The order reflects that the claim was being denied based upon the lack of an employer/employee relationship because the worker was terminated on April 22, 2014. Similarly, on June 26, 2014, the DHO denied the claim based upon the documentation submitted by SIU. The SHO also denied the claim stating that the decision was based upon SIU records and written statements from Peggy Lansing, Brad Lansing, and Jacob Smith, "all of whom agree the applicant was **not employed with the named employer on the alleged date of injury**." [Emphasis added.]
>
> [Seven] On September 18, 2014, BWC Auditor Joe Maurizi conducted an audit of the employer's business for the periods set forth above. The audit resulted in significant

No. 16AP-5

findings based upon payments picked up for various workers that the employer considered to be independent contractors. Specific Description of Operations and Findings & Comments from the audit, are as follows:

THE RISK IS A CONTRACTOR THAT CUTS DOWN TREES. THE RISK USES A NON MECHANIZED PROCESS (HAND CHAIN SAWS ) TO CUT DOWN TREES. THEY OPERATE A SKIDDER TO HAUL THE TREES TO AN OPEN AREA, IN WHICH A LOADER LOADS THE TREES ON THE TRUCK TO BE DELIVERED TO THE SAWMILL. THE RISK OWNS ALL EQUIPMENT USED. ALL OF WHICH ARE REPORTABLE TO MANUAL 2701.

THE RISK ISSUED 1099'S FOR ALL INDIVIDUALS THAT WORKED FOR THE EMPLOYER. IN 2012 THEY DID HAVE TWO THAT WORKED AS DRIVERS HOWEVER THE[Y] ALSO WORKED PERFORMING THE OTHER FUNCTIONS AS WELL (CUTTING TREES, OPERATING SKIDDERS & LOADERS ). THERE WAS NO SEGREGATION. THE RISK DID PROVIDE A[N] UNSIGNED CONTRACT. HOWEVER IT DOES NOT ADDRESS TERMS OF WORK. THE RISK OWNS ALL EQUIPMENT THE CONTRACTORS USE. THE EMPLOYER MADE VERBAL AGREEMENTS ON WHAT THEY WOULD PAY INDIVIDUALS TO PERFORM ANY WORK. THERE IS [SIC] NO INVOICES OR ANY OTHER DOCUMENT TO SUPPORT INDEPENDENCE. PER TAX RETURN SHOWED THE EMPLOYER WAS [SIC] EXPENSES FOR WORK CLOTHES, LICENSE TAGS, CELL PHONE & SUPPLIES, EMPLOYEES FINES & DRUG TEST. THESE ARE THE ACTUAL TITLES ON THE TAX RETURN DEDUCTIONS SECTION.

(Emphasis sic.)

{¶ 18} The adjudicating committee outlined the relevant case law for determining whether someone is an employee or an independent contractor, stating:

In *Gillum v. Industrial Com.,* 141 Ohio St. 373, 48 N.E.2d 234, 1943 Ohio LEXIS 427, 25 Ohio Op. 531 (Ohio 1943), paragraph 2, syllabus, the Supreme Court of Ohio set forth the test for determining whether a person is an independent contractor, as follows:

No. 16AP-5

Whether one is an independent contractor or in service depends upon the facts of each case. The principal test applied to determine the character of the arrangement is that if the employer reserves the rights to control the manner or means of doing the work, the relation created is that of master and servant, while if the manner or means of doing the work or job is left to one who is responsible to the employer only for the result, an independent contractor relationship is thereby created.

In determining the amount of control exercised over the alleged employee in order to determine his status, the Supreme Court has set forth certain factors to be considered. These factors include such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools, and personnel used; who selects the routes traveled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts. *Bostic v. Connor,* 37 Ohio St.3d 144, 146, 524 N.E.2d 881, 1988 Ohio LEXIS 164 (Ohio 1988).

Generally, independent contractors provide goods or services to another entity under terms specified in a contract or within a verbal agreement Unlike an employee, an independent contractor does not work regularly for an employer. Independent contractors usually perform a special service that is not in the normal course of business of the employer. Independent contractors often advertise, maintain a visible business location, and are available to work in a trade, or some other service. Contractors often work through a sole proprietorship, LLC, or franchise, which they themselves own. As a business owner, the independent contractor incurs its own expenses to provide the contracted service. Independent contractors also typically retain control over their schedule and number of hours worked, jobs accepted, and performance of their job. In addition, they may have a major investment in equipment, furnish all their own supplies, provide their own insurance and repairs, and cover all other expenses related to their business.

In denying OVSH's protest, the adjudicating committee stated:

In this particular case, the employer's representative stated in the initial complaint and at hearing that the employer's need for workers is not regular and may be sporadic. The Committee believes that the record supports this statement.

No. 16AP-5

At the same time, employment status under RC 4123.01 and the Ohio common law is not limited to full time workers. Rather, workers' compensation coverage is still required for part time employees, as well as casual workers earning more than $160.00 per calendar quarter.

In terms of the "right to control," the Committee was presented with credible testimony that the employer's husband is perceived as being the manager. Moreover, the report from BWC SIU referenced in paragraph 5 of the *Findings of Fact,* above, confirms Mr. Lansing's presence on the jobsite. At the hearing, the employer's representatives conceded that at least in some cases, the workers are transported from the employer's location to the worksite. In addition, with regard to Kelly Smith, Peggy Lansing provided a statement that after being contacted by her husband, she personally fired Mr. Smith.

While perhaps less important than control over the workers, there are additional factors that support an employer/employee relationship with regard to the workers at issue. There was no evidence that any of the workers had their own businesses in the form of signed contracts with any individual business owners. The workers did not have any of their own expenses associated the work performed for Peggy Cooper/Select Harvesting. While some of the workers may have had their own hand tools, it is apparent that tools were made available by the employer and any larger equipment was provided by the employer. The employer's representative stated that the employer had no "continuing relationship" with the workers. However, the information obtained in the audit shows that there were continuing relationships with many of the workers. For example, Kelly Smith was paid almost $34,000 by the employer in 2012.

The employer's representative stated that the workers are able to work for others. Given that there was or is not continuous work available, the Committee recognizes that many or all the workers may have performed work for others. While, they may not have had specific daily hours, the opportunities to work are at times specified by the employer. Finally, the firing of an individual worker is not consistent with independent contractor status.

(Emphasis sic.)

No. 16AP-5

{¶ 19} 12. Relator requested a hearing before the administrator's designee and that hearing occurred on September 10, 2015. After setting out the basic test for determining whether workers are employees or independent contractors is the amount of control the employer exercises over the manner and means of the work, the administrator's designee discussed the evidence presented by OVSH as follows:

> OVSH's representative stated that OVSH does not control the manner or means of the work. OVSH stated that the workers get to the job site by any means they chose and can stay overnight at their own expense. While OVSH prefers that the workers drive themselves to the work location, OVSH testified that there have been occasions, for logistical reasons, where workers meet at OVSH's main office and then travel together to the jobsite, following Brad Lansing, an OVSH employee. The main office is the home of the Lansings.
>
> OVSH's representative stated that OVSH does not control the hours worked. The workers do not arrive all at the same time. The days worked are determined by need and contract with the Lansings. The workers are contacted to see if they are available for the job once the need is established, and are only contacted for that specific job. Workers are paid by the terms of the contract. There are no regular wages.
>
> OVSH stated that Brad Lansing is not a supervisor; but as the general contractor, he is responsible for the work and makes sure the workers stay within the boundaries of the land that they are permitted to cut timber. OVSH's representative stated that Brad Lansing is not titled as a manager. Some workers do refer to him as such, but it is not his title. The workers do not issue progress reports. The workers will, and OVSH prefer; that they provide their own tools if they have them. However, OVSH does have equipment available and supplies it [to] the workers if needed in order to avoid a work stoppage. If a worker shows up and does not have a tool that he needs, OVSH does not want that to impact the work schedule.
>
> OVSH's representatives stated that the nature of OVSH's business does not allow for them to have regular employees, as the need for workers changes with each job. Each worker is allowed to work for themselves and even work on the same day they work for OVSH. Most of the workers do other odd jobs. The job does not require special skills and the workers

No. 16AP-5

are not trained by OVSH. OVSH does not have an ongoing relationship with the workers.

There was some discussion about the Kelly Smith matter, whether Smith was "fired" by Brad Lansing, and whether that action indicated an employment relationship. The Administrator's Designee notes the discussion of this issue in the Adjudicating Committee order of May 5, 2015, and the testimony at the Administrator's Designee hearing.

Thereafter, the administrator's designee set out the bureau's position:

The Bureau's auditor stated that there were no written contracts available for the Bureau to review, nor were there any invoices from the alleged independent contractors to OVSH for the work performed. The Bureau auditor stated that there were no W-2 forms and that there were 1099 forms. More significantly, the Bureau auditor stated that the OVSH tax returns show deductions for worker fines, work clothes, supplies, and drug tests. The Bureau auditor stated that the workers used OVSH equipment, loading timber with OVSH loaders and skidders. The Bureau representative claims that the Bureau's investigation establishes that Brad Lansing is the manager and foreman on the job site, and that all of the workers recognize him as such, proving that he is in a management position over the workers. The workers also do not retain their own insurance, which would be expected if the workers were self employed. Finally, the Bureau testified that the workers do not appear to be [in] a position of sustaining a profit or loss, an indication that they are not actually in a business, but are employees paid by the job.

{¶ 20} In finding that OVSH exercised sufficient control over the manner and means of performing the work, the administrator's designee made the following findings:

The Administrator's Designee finds that the temporary or sporadic nature of the worker [sic] available for the workers is not a determining factor of whether the workers are employees or independent contractors. As noted by the Bureau auditor, workers who work occasionally are referred to as spot labor, but there is still an employer-employee relationship with spot labor. The May 5, 2015, order of the Adjudicating Committee also addressed this issue as follows:

In this particular case, the employer's representative stated in the initial complaint and at hearing that the employer's need for

No. 16AP-5

> workers is not regular and may be sporadic. The Committee believes that the record supports this statement. At the same time, <u>employment status under RC 4123.01 and the Ohio common law is not limited to full time workers</u>. Rather, workers' compensation coverage is still required for part time employees, as well as casual workers earning more than $160.00 per calendar quarter. (emphasis added)

The Administrator's Designee finds that OVSH exercises sufficient control over the manner and means of doing the work such that the workers are employees. The Administrator's Designee adopts the reasoning of the Adjudicating Committee in its May 5, 2015, [sic] order as follows:

> In terms of the "right to control," the Committee was presented with credible testimony that the employer's husband is perceived as being the manager. Moreover, the report from BWC SIU referenced in paragraph 5 of the Findings of Fact, above, confirms Mr. Lansing's presence on the jobsite. At the hearing, the employer's representatives conceded that at least in some cases, the workers are transported from the employer's location to the worksite. In addition, with regard to Kelly Smith, Peggy Lansing provided a statement that after being contacted by her husband, she personally fired Mr. Smith.
>
> While perhaps less important than control over the workers, there are additional factors that support an employer/employee relationship with regard to the workers at issue. There was no evidence that any of the workers had their own businesses in the form of signed contracts with any individual business owners. The workers did not have any of their own expenses associated the work performed for [OVSH]. While some of the workers may have had their own hand tools, it is apparent that tools were made available by the employer and any larger equipment was provided by the employer. The

No. 16AP-5

> employer's representative stated that the employer had no "continuing relationship" with the workers. However, the information obtained in the audit shows that there were continuing relationships with many of the workers. For example, Kelly Smith was paid almost $34,000 by the employer in 2012.
>
> The Administrator's Designee also finds that the Bureau's determination of independent contractor status is for the purpose of reporting Ohio workers' compensation payroll and premiums only, and this determination is not conclusive or binding on OVSH for other payroll reporting obligations, such as to the Internal Revenue Service for taxes or to the Ohio Department of Job and Family Services for unemployment compensation.

(Emphasis sic.)

{¶ 21} 13. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 22} For the reasons that follow, it is this magistrate's decision that relator has failed to demonstrate that the BWC abused its discretion in finding that OVSH's workers were employees and, as such, OVSH owed premiums to the BWC, and this court should deny relator's request for a writ of mandamus.

{¶ 23} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 24} Ohio employers are required to report their payroll to the BWC and are required to keep those records available for inspection by the BWC. Specifically, R.C. 4123.24 provides:

> Every employer amenable to this chapter shall keep, preserve, and maintain complete records showing in detail all expenditures for payroll and the division of such expenditures into the various divisions and classifications of the employer's business. The records shall be preserved for

No. 16AP-5

> at least five years after the respective times of the transactions upon which the records are based.
>
> All books, records, papers, and documents reflecting upon the amount and the classifications of the payroll expenditures of an employer shall be kept available for inspection at any time by the bureau of workers' compensation or any of its assistants, agents, representatives, or employees. If an employer fails to keep, preserve, and maintain the records and other information reflecting upon payroll expenditures, fails to make the records and information available for inspection, or fails to furnish to the bureau or any of its assistants, agents, representatives, or employees, full and complete information in reference to expenditures for payroll when the information is requested, the bureau may determine the amount of premium due from the employer upon such information as is available to it, and its findings are prima-facie evidence of the amount of premium due from the employer.

{¶ 25} In the present case, OVSH came under scrutiny by the BWC after Kelly Smith filed a workers' compensation claim asserting that he was injured during the course of his employment with OVSH. As the stipulated evidence reveals, OVSH argued that Smith was not entitled to workers' compensation benefits for his alleged injury because Smith had been terminated the day before he allegedly was injured. Specifically, in the addendum to memorandum to claim file, Jason Price of the Portsmouth Special Investigations Unit, noted in the June 23, 2014 addendum:

> On May 14, 2014, Fraud Analyst Rita Johnson (Analyst Johnson) received a notification that Kelly Smith (SMITH) filed a claim. SMITH had previously filed a false claim in 2010 against a company he was never employed by. On December 16, 2011, SMITH pled no contest to Attempted Workers' Compensation Fraud, was fined $250, and received 1 year of community control, and 35 hours of community service.
>
> On June 2, 2014, Agent Price conducted an interview with Brad Lansing (B. Lansing), Manager/Foreman for Ohio Valley Selective Harvesting. B. Lansing confirmed that SMITH was an employee of the business for approximately 2 years. When SMITH presented to work on April 22, 2014, SMITH requested B. Lansing drive him into town so he could

obtain a pain pill. B. Lansing refused, and all employees proceeded to the job site. Around lunch time, SMITH again requested B. Lansing to take him to get a pain pill so he wouldn't be sick, and B. Lansing again refused. B. Lansing notified his wife and business owner Peggy Lansing (Lansing) of the events. B. Lansing and the rest of the employees arrived at the office at the end of the day between 3:00 and 4:00 pm. Lansing met SMITH outside, handed him his final paycheck, and terminated his employment.

B. Lansing stated that on April 23, 2014, SMITH presented to the job site without permission. SMITH took a chainsaw from an employee, and proceeded down in the brush. SMITH then began asserting a tree fell on his leg, and he injured himself. B. Lansing then remained in view of SMITH while waiting for Lansing to arrive and transport SMITH to the hospital. B. Lansing advised SMITH indicated he was fine, and requested to operate a loader the rest of the day. Lansing then arrived and transported SMITH off the job site.
* * *

On June 2, 2014, Agent Price conducted an interview with Jake Smith (J. Smith), identified employee of Ohio Valley Selective Harvesting, and nephew of SMITH. J. Smith stated that near the end of the work day on April 22, 2014, SMITH came up to him and requested he drive him to a location to obtain a pain pill, and J. Smith refused. J. Smith advised all the employees returned to the office that day between 3:00 and 4:00 pm. J. Smith confirmed Lansing met SMITH outside the office, handed him a paycheck, and terminated him on the spot. J. Smith stated on April 23, 2014, he was notified by another employee, Cody Lansing that SMITH was present and saying a tree fell on him and injured his leg. When J. Smith arrived to where the alleged injury occurred, SMITH was sitting on a tree stump, and there were no trees that had fallen on his leg. J. Smith stated SMITH then began walking around the job site unassisted, and saying his leg was injured. Lansing then arrived to the job site and transported SMITH off the premises.

(Emphasis sic.)

{¶ 26} When the BWC conducted its investigation of OVSH concerning payroll and the payment of premiums, OVSH made statements which contradicted the statements

No. 16AP-5

made when they challenged Smith's workers' compensation claim. OVSH told the BWC investigators that they had no employees, that everyone who did work for them was an independent contractor, that Brad Lansing was not a manager even if some people thought he was, and that the statement made to Smith, "you're fired," was simply a poor choice of words.

{¶ 27} There was and still is contradictory evidence in the record and the BWC evaluated that evidence and ultimately concluded that OVSH does, in fact, have employees, failed to report payroll, and owed premiums. As this court explained in *State ex rel. Labor Works of Dayton LLC v. Ohio Bur. of Workers' Comp.,* 10th Dist. No. 10AP-22, 2010-Ohio-6299, ¶ 6:

> Pursuant to R.C. 4123.24, employers are required to "maintain complete records" that "detail all expenditures for payroll," including "the division of such expenditures into the various divisions of the employer's business." On an employer's failure to keep such records, "the bureau may determine upon such information as is available to it the amount of premium due from the employer and its findings shall constitute prima facie evidence of the amount of premium due from the employer." Ohio Adm.Code 4123-17-17. When the bureau conducted an audit of relator, relator failed to provide the information that was requested. As a result, the bureau estimated the premium due.

{¶ 28} Based on a review of the stipulation of evidence, the magistrate finds that relator has failed to establish that the BWC abused its discretion when it determined that OVSH has employees, failed to report payroll as required by law, and owed premiums, and this court should deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
STEPHANIE BISCA

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign
as error on appeal the court's adoption of any factual finding

No. 16AP-5

> or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).