[Cite as *State ex rel. Friendship Supported Living, Inc. v. Ohio Bur. of Workers' Comp.*, 2021-Ohio-4490.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel.,                                    :
Friendship Supported Living, Inc.,
                                                 :
          Relator,                                              No.  19AP-882
                                                 :
v.                                                            (REGULAR CALENDAR)
                                                 :
Ohio Bureau of Workers' Compensation,
                                                 :
          Respondent.
                                                 :

D E C I S I O N

Rendered on December 21, 2021

*Law Office of Tracy L. Turner, LLC,* and *Tracy L. Turner* for
relator.

*Dave Yost,* Attorney General, and *John R. Smart,* for
respondent Ohio Bureau of Workers' Compensation.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

NELSON, J.

{¶ 1} Are the people who contracted (non-exclusively) with Friendship Supported
Living, Inc. ("Friendship") to provide direct in-home care for individuals with
developmental disabilities employees of Friendship for workers' compensation purposes,
or are they independent contractors?   We are asked to review the decision of the Ohio
Bureau of Workers' Compensation ("BWC") under the standards that obtain in an action
for a writ of mandamus.

{¶ 2} To offer just a bit of background texture:

- The record reflects that the State of Ohio, through its Department of
  Developmental Disabilities ("ODDD"), has treated people *it* engages to provide

the same services (including, apparently, some of the same people who also contract with Friendship) as independent contractors;

- The Franklin County Court of Common Pleas, after careful review on a record that overlaps significantly with the stipulated record here, albeit under different statutory provisions and on a different standard of review than we apply, found that the evidence there "establishe[d] that the workers at issue were independent contractors rather than covered employees" for unemployment compensation purposes, *Friendship Supported Living, Inc. v. Dir., Ohio Dept. of Job and Family Servs.*, Franklin C.P. No. 15CVF-8721 (March 7, 2016) at 9; and

- A BWC auditor concluded in 2006 that Friendship's " '1099 home health workers are considered independent contractors.' " Stip.R. at 125 (Adjudication Committee Order quoting June 19, 2006 audit findings), and the record also reflects a "REVISED" description of findings from BWC's June 19, 2008 audit of Friendship, finding (maybe once again; the record is somewhat muddled here) that "1099 home health workers are considered independent contractors." Stip R. at 6 (perhaps overlooked by the BWC Adjudicating Committee for the present matter, which cited at page 2 of its December 5, 2017 order to a different outcome from that 2008 audit, without mentioning the revision).

{¶ 3} But after another audit and other administrative proceedings as outlined in the appended magistrate's decision, the BWC on November 26, 2019 issued a Final Order of the administrator's designee determining that the workers at issue are Friendship employees and not independent contractors. Friendship petitioned this court for a writ of mandamus to require the BWC to reclassify the direct care workers as independent contractors, and our magistrate, in his decision from July 23, 2021, has recommended that the BWC determination be upheld and that no writ issue. Friendship has filed objections to the magistrate's decision, and the BWC has filed a memorandum in response to those objections.

{¶ 4} In ruling on the objections, we review the magistrate's decision independently, and may adopt or reject it in full or in part. Civ.R. 53(D)(4)(b) and (d). As the magistrate's decision correctly noted, in order to gain the writ it seeks, Friendship must show a clear legal right to the relief sought, a clear legal duty on the part of the BWC to provide such relief, and the lack of an adequate remedy in the ordinary course of law.

Magistrate's Decision at ¶ 49, citing *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).

{¶ 5}    In this context, the writ can issue only on a showing that the BWC abused its discretion in classifying the workers at issue: "The central issue in this case is whether the administrator's designee abused his discretion in determining that Friendship's homecare providers were employees rather than independent contractors, thereby requiring Friendship to include" them for purposes of workers' compensation premium calculation. Magistrate's Decision at ¶50.  This court has said that the BWC abuses its discretion when it reaches its determination without "some evidence" to support its findings.  *See State ex rel. Ugicom Ents. v. Morrison*, 10th Dist. No. 17AP-895, 2021-Ohio-1269, ¶ 18 (citing cases within BWC's core competencies: *State ex rel. Fiber-Lite Corp. v. Indus. Comm.*, 36 Ohio St.3d 202 (1988) [on questions "involving specific safety requirements," *see id.* at 204], and *State ex rel. Bennett v. Aldi, Inc.*, 10th Dist. No. 14AP-632, 2016-Ohio-83 [involving claim for permanent total disability]); *compare State ex rel. Schaengold v. Ohio Pub. Emps. Retirement Sys.*, 114 Ohio St.3d 147, 2007-Ohio-3760, ¶ 19-20 (reciting that standard in case involving employee/independent contractor distinction for state retirement board coverage decision before concluding: "There is sufficient evidence here to support the board's determination that Schaengold was an independent contractor rather than a public employee when he served as a temporary magistrate for the Dayton Municipal Court").

{¶ 6}    We do not construe this standard to make BWC employee/independent contractor determinations absolutely unreviewable.  Guided by the Supreme Court of Ohio, we recognize that " '[a]s a practical proposition, *every* contract for work to be done reserves to the  employer a certain degree of control, at least to enable him to see that the contract is performed according to specifications.' "  *Gillum v. Indus. Comm.*, 141 Ohio St. 373, 382 (1943), quoting 27 American Jurisprudence, Section 7, at 488 (emphasis added, in case finding Workers' Compensation Act inapplicable because worker was independent contractor).  In this sphere, then, revolving around who "reserves the right to control the manner or means of doing the work," *id.* at paragraph two of the syllabus, we apply the relevant, highly deferential some-evidence standard in light of the case- and fact-specific analysis illustrated, for example, by *Schaengold*, s*ee* 114 Ohio St.3d 147, at ¶ 20-23, and in light of a contracting company's inevitable right to see that the outcome of work contracted for accords with particular specifications.  A central question, therefore, is whether the BWC shows some evidence that Friendship controlled the manner and means by which the

direct care workers did their jobs.  In conducting that limited inquiry, we summarize what the record reflects of the nature of the work at issue, how it is performed, and Friendship's relationship to these direct care workers.

{¶ 7}  Friendship is certified as an agency provider of in-home care by the Ohio Department of Developmental Disabilities.  *See* Magistrate's Decision at ¶ 44 (quoting BWC adjudicating committee).  As an agency provider (rather than as an "independent," self-employed individual provider as also certified by ODDD), Friendship maintains state-required liability insurance and holds itself out as able to furnish care to people with developmental disabilities.  *Id.* at 7-8 (quoting adjudicating committee).  "[C]onsumers have a choice of certified agencies" from which to select, *id.* at 12; if Friendship is picked by the customer, " 'ODDD pays Friendship because they [sic] are the agency provider responsible for providing the services,' " *id.* at 8 (quoting adjudicating committee).  Services are provided according to "an individual service plan ('ISP') developed by the state or county agency."  *Id.* at 2.  *See also Friendship* at 2 (citing to testimony also of record here: ISP "becomes [Friendship's] contract" with the government; "[t]he ISP, controlled by the State, establishes the number of hours and timing of services for the client").

{¶ 8}  As of the 2017 audit, Friendship had six W-2 employees whose employee status is not at issue here.  One or more of them apparently interacts with the relevant government authorities, *see* Magistrate's Decision at ¶ 56; one is a corporate officer who also performs clerical duties, and five assist clients with matters including services " 'that the contractors do not provide.  This includes redetermination of individuals, scheduling doctor appointments along with transporting clients as needed,' " *see id.* at ¶ 40 (quoting audit), and working with the clients to schedule days and times to receive services, *see* adjudicating committee order reciting facts as adopted by BWC final order, at 2 ("[t]he company performs all scheduling of days and times when the contractor is to work").

{¶ 9}  Friendship contracts with the tax-form-1099 workers at issue to "provide[] the actual in-home care and assistan[ce] to consumers[.]"  Magistrate's Decision at ¶ 38; *see also* Stip.R. at 207 (sample "Work for Hire Agreement for Self Employed Independent Contractors and Sole Proprietors"; capitalizations adjusted).  The undisputed record reflects that these contractors do not work on Friendship premises, but rather "provide[] all services at the consumer's home."  Stip.R. at 14 (Friendship petition for [audit] appeal, verified as to facts by June 8, 2017 Affidavit of Friendship owner Florence Hein and very largely consistent with August 18, 2015 testimony of Ms. Hein on examination as also

contained in this record, *see id.* at 41-81).  The record further shows that these contractors "decide how many hours, which days, and what times they want to work.  [They communicate their availability to Friendship, and Friendship] tries to match [them] with a consumer."  *Id.* at 13.  The direct care provider can choose whether or not to work with a particular consumer.  *Id.* at 54; *see also Friendship* at 3. "Once at the consumer's home, the direct care worker and the consumer mutually decide what they will do [consistent with the ISP, as described at page 2 of the verified petition for (audit) appeal] while the direct care worker is there." *Id.* at 13.  This control over their own schedules further distinguishes the contractors from Friendship's W-2 employees, who "are required to work set hours and are on call,"  Stip.R. at 14; when direct care contractors are unavailable, Friendship will fill in the gap by "requiring one of [its] employees to perform the services," *id.* at 15.

{¶ 10} It is further undisputed on the record that "[m]ost of Friendship['s] * * * direct care providers work for short periods of time.  Some direct care providers take extended breaks from receiving assignments * * * * Friendship does not guarantee any direct care provider work or a certain number of hours per week."  *Id.*  The direct care providers can "refuse hours when they do not want to work," *id.* at 13, they can decline to work for particular consumers, *id.* at 54, and they invoice Friendship and are paid only for the hours they work, *id.* at 13.  Therefore, "if a consumer with whom a direct care provider is working decides that they do not need services on the day the direct care worker is scheduled, then the direct care worker does not get paid." *Id.* at 15.  But "[a]fter two years, the direct care workers are able to apply for employment as [Friendship] health service coordinators."  *Id.* at 14; *see also* BWC Final Order at 4 ("Friendship clarified that the jobs that workers may apply for after 24 months with Friendship are for administrative functions and not for the functions that the workers had performed as alleged independent contractors.").

{¶ 11} Friendship "provides no training to any direct care provider"; it furnishes no tools; and it "does not reimburse direct care providers for any expenses" (apart from mileage costs for driving consumers, for which expenses the State of Ohio reimburses Friendship).  Petition for [Audit] Appeal at 4, Stip.R. at 14.

{¶ 12} The record appears undisputed, too, that Friendship does not supervise the work of the direct care providers while that work is being performed.  *Id.* at 3, Stip.R. at 13 ("No one at Friendship * * * supervises the direct care providers"); BWC Final Order at 4 ("The nature of the services provided by the workers, in the home of a client consumer, will

of course provide some flexibility and freedom for the worker.  That is the nature of the service at issue here").  Rather, as the magistrate observed, Friendship "meet[s] with consumers on a regular basis to ensure that consumers are receiving appropriate services" as assessed by Friendship under the ISP.  Magistrate's Decision at ¶ 59 (noting, too, that "Friendship stressed * * * that it did not monitor the homecare providers as they performed their tasks and executed the ISP," while also stating that "minute-by-minute supervision is not the test of oversight for these purposes"); *see also* BWC Final Order at 4 (Friendship "monitor[s]" contractor performance "for compliance and quality").

{¶ 13} The direct care contractors are not required to perform their services exclusively through Friendship.  "In fact, while working for Friendship * * *, direct care service providers perform services as independent contractors for other agency providers who are in direct competition with Friendship * * * including the State of Ohio."  [Verified] Petition for [Audit] Appeal at Stip.R. 12.  "Friendship * * * has direct care contractors who provide services for the State of Ohio and Friendship * * * simultaneously."  *Id.  See also* Stip.R. at 56 (Ms. Hein's testimony that "I have some independent contractors that work for me and that also work [as such] for the state"); *Friendship* at 4 (noting that "Ms. Hein stated [in testimony also incorporated into the record here] that the State and other competitors also have independent contractors that provide the same services as [Friendship's] direct care staff").

{¶ 14} BWC concluded in its Final Order that "the autonomy and flexibility common for employees in this field does not equate to independent contractor status."  BWC Final Order at 4.  As the BWC recognizes: " 'Whether one is an independent contractor in service depends on the facts of each case.  The principal test applied to determine the character of the arrangement is that if the employer reserves the right to control the *manner or means* of doing the work, the relation created is that of master and servant, while if the manner or means of doing the work or job is left to one who is responsible to the employer only for the result, an independent contractor relationship is thereby created.' "  *Id.* at 1, quoting *Gillum*, 141 Ohio St. 373, at paragraph two of the syllabus (emphasis added).  *Compare Bostic v. Connor*, 37 Ohio St.3d 144 (1988), paragraph one of the syllabus ("The key factual determination is who had the right to control the manner or means of doing the work").

{¶ 15} After rehearsing the arguments and evidence provided by both sides, the administrator's designee "conclude[d] that there is sufficient control by Friendship over the activities of the workers to conclude that the workers are employees of Friendship."  BWC

Final Order at 4. To substantiate this conclusion, the Final Order found that "Friendship controls the workers by monitoring their activities for [ISP] compliance and quality. The fact [that] the consumer and worker may mutually decide activities does not mean that the worker is free from supervision or control. The workers have more autonomy and flexibility than in some work setting[s], but the autonomy and flexibility common for employees in this field does not equate to independent contractor status." *Id.*

{¶ 16} But in this setting, on the facts before it, even BWC's invocation of the word "quality" regarding results from services provided by the direct care workers electing day-to-day activities in consultation with the clients and operating without specific Friendship instruction or training cannot trump the longstanding directive of *Gillum:* " 'The control of the work reserved in the employer which effects a master-servant relationship is control of the means and manner of performance of the work, as well as of the result; *an independent contractor relationship exists where the person doing the work is subject to the will of the employer only as to the result, but not as to the means or manner of accomplishment.*' " *Gillum*, 141 Ohio St., at 382, quoting 27 American Jurisprudence, Section 7, at 488 (our emphasis). " 'Thus, a person employed to perform certain work is not necessarily a mere servant because the contract provides that the work shall be subject to the approval or satisfaction of the employer. Such a provision is not an assumption by the employer of the right to control the person employed as to the details or method of doing the work, but is only a provision that the employer may see that the contract is carried out according to the plans.' " *Id.*, multiple further citations omitted.

{¶ 17} Here, the "plans" were the individual service plans, the ISPs, as approved by the state or the county for the agency provider. We note that *Gillum*'s directive has remained good law in Ohio over the decades. *See, e.g., Frankhauser v. Knight-Ridder Newspaper*, 27 Ohio App.3d 236, 238 (9th Dist.1986) ("means or manner of accomplishment" not implicated where "[t]he result reserved by the newspaper is the carrying and delivery of the papers in a prompt and careful manner. [Citation omitted.] The means of achieving the result (whether to use a car or bike, or to walk; the order in which papers are to be delivered; and the places where the papers are to be placed) are left to the newscarriers"); *Eisenhour v. State Unemp. Comp. Bd. of Rev.*, 10th Dist. No. 97APE03-349, 1997 Ohio App. Lexis 3631, *6-7 (Aug. 12, 1997) (emphasizing trial court's conclusion that company "controlled only the end result," while the in-home senior care workers there controlled "the means and manner of the work performed").

{¶ 18} The remaining two paragraphs of analysis in the BWC's Final Order were devoted to distinguishing the *Friendship* result, that (one of the kind of) direct care providers whose status is at issue here was an independent contractor for unemployment compensation purposes. Final Order at 4-5. BWC is correct that that decision is not binding on it here; while a state agency and Friendship both litigated on a record some of which was transported to this matter, the governing statute there and the trial court's standard of review for an administrative appeal pursuant to R.C. 4141.26(D)(2) do not apply to this mandamus action against the BWC. *Compare, e.g., Alternatives Unlimited-Special, Inc. v. Ohio Dept. of Edn.*, 168 Ohio App.3d 592, 2006-Ohio-4779, ¶ 38, 46 (10th Dist.) ("An 'issue or a fact that was fairly, fully, and necessarily litigated and determined in a prior action, may not be questioned in a subsequent action between the same parties or their privies,' " adding that "[r]egardless of which agency is acting, it is doing so in order to advance or protect the state's interests" and so "agencies, departments, and instrumentalities are all considered to be the State.").

{¶ 19} Nonetheless, recognizing those differences while also noting the overlap of the records, we do find *Friendship* instructive in the way that it characterizes various facts that the record in this BWC matter also reflects. *Compare* Magistrate's Decision at ¶ 47 ("More or less contemporaneously to the present proceedings before the BWC, Friendship successfully challenged a similar determination by the Unemployment Compensation Board of Review * * * * A transcript of the testimony of Florence Hein, a principal of Friendship, before the court of common pleas [sic; apparently actually the Unemployment Compensation Review Commission], was later presented and accepted as evidence before the adjudicating committee in BWC proceedings."). The reviewing judge in *Friendship* noted that the record there reflected, as it does here, that a direct care provider (there, a particular named person) was not controlled by Friendship as to "how the work was performed." *Friendship* at 7-8. Moreover, also as reflected for providers here, she "could call in to see if hours were available or choose not to work." *Id.* at 8. "The essential and determining factor is the right to direct or control the performance of services. The evidence shows [there, as here] that [the direct care worker] worked if and when she was available, with no set hours. [Friendship] did not supervise [her] in performing the services; rather, the services were performed off-premises according to the ISP established through the State." *Id.* On the record before it then, which is not identical to the record here but which overlaps in many significant respects, the *Friendship* court concluded the

evidence showed "that the workers at issue were independent contractors rather than covered employees." *Id.* at 9.

{¶ 20} While *Friendship* is by no means dispositive for our purposes here and while we do not rely upon that court's assessment of evidence not before us, we do not subscribe to the interpretation of the administrator's designee that *Friendship* " 'did not examine the obligation Friendship * * * has with ODDD to provide services as an agency provider[,]' " or properly reflect on whether " 'the "contractor" has an independent business or occupation.' " *Compare* BWC Final Order at 4-5, quoting Adjudicating Committee. That the governmentally established ISP sets the requirements of the care to be provided was a salient feature of the *Friendship* decision, *see Friendship* at 2, 7, 8, and we consider it significant here. But that does not at all cut in favor of BWC's position, and BWC points to no evidence that Friendship directs the direct care providers on the manner or means by which they go about fulfilling those requirements. And *Friendship* was clear that the evidence there reflected that the direct care provider "worked for [Friendship] and for other companies and made her services available to the public," *id.* at 8, just as the record here reflects that Friendship does not have exclusive relationships with the direct care providers, some of whom also work for Friendship competitors. We do not find these criticisms of *Friendship* well taken.

{¶ 21} The magistrate reviewed the briefs, as we have, digested the arguments of the parties regarding Friendship's mandamus complaint, and arrived at findings of fact and conclusions of law. His decision lays out well and at some length the BWC proceedings preliminary to the conclusions of the administrator's designee in his Final Order (the conclusions at issue here). And it accurately captures the essence of that Final Order and the basis that the BWC ultimately adopted in reaching that Order. Magistrate's Decision at ¶ 46 (omitting, reasonably, that Order's further arguments against *Friendship* beyond the point that it is not binding here). It then correctly recites the relevant standards that we must apply. *Id.* at ¶49-50. It also properly identifies the "threshold issue" of "the amount of control exercised by the putative employer over the manner and means of performing the work," as laid out in *Gillum*. *Id.* at ¶52. And at ¶53, it correctly paraphrases *Bostic*'s instruction that: "The determination of who has the right to control must be made by examining the individual facts of each case. The factors to be considered include, but are certainly not limited to, such indicia as who controls the *details* and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who

selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts." 37 Ohio St.3d, at 146 (emphasis added). The magistrate's decision reflects significant and helpful work, and we are largely with him up to that point.

{¶ 22} However, the magistrate then identifies as "[o]ne of the most pertinent facts" relied on by the BWC "that ODDD recognizes two types of providers, independent providers and agency providers." *Id.* at ¶55. But the fact that BWC certifies "independent" providers does not seem to us at all to mark those who contract with a certified agency to provide direct in-home care as "employees." And, as Friendship's objections note, the magistrate seems to have been somewhat off base in stating that "Friendship's homecare providers were not documented in this case as being individually certified to provide such care under ODDD programs." *Compare id. with* Friendship Objections to Magistrate's Decision at 5. Ms. Hein's testimony from August 18, 2015, during the period under review, did reflect that "I have some independent providers for the State of Ohio that work for me and also work for the state * * * and [the state] can afford to pay more quite frankly so they're a big competitor of us." Stip.R. at 56-57; *see also, e.g.*, (Verified) Petition for (Audit) Appeal at 2, Stip.R. at 12 ("while working for Friendship * * *, direct care service providers perform services as independent contractors for other agency providers who are in direct competition with Friendship * * * including the State of Ohio").

{¶ 23} In any event, whether or not any particular quantum of providers who worked through Friendship also contracted directly with ODDD (as opposed to being free to contract, simultaneously, with other agency providers, as the record reflects some also did) would not count in favor of their being employees even if they elected to contract only with Friendship (to work whatever hours they chose). The magistrate's decision seems to make its same point later in saying that "Friendship's homecare providers cannot establish a care position with a Friendship consumer outside of the relationship agreement between the provider and Friendship," Magistrate's Decision at ¶57, but again this perspective does not take into account that Friendship's contract with its "Self Employed Independent Contractors and Sole Proprietors" does not purport to be exclusive and that just as customers can choose providers other than Friendship, the direct care providers are free also to work through other agencies.

{¶ 24} The magistrate's decision does not address what *would* seem to be at least an interesting if not "pertinent" related point that, regardless of any affiliation with Friendship,

the state has considered *its own* direct care workers to be independent contractors. *See* Objections at 5 (objecting that magistrate "rejected" its argument on that score). The testimony admitted into the record was undisputed on this point. *See* Stip.R. at 56 (Ms. Hein: "we are an agency provider, but the State of Ohio also has independent providers which are independent contractors. They bill, they provide the same services * * * *"); *see also* Stip.R. at 12. BWC's Final Order indeed conceded the fact, even while quoting a BWC representative's assertion that "on the website of the Department of Developmental Disabilities there is [unspecified] evidence that the Department is moving away [how and to what extent is not specified] from the independent contractor model to a co-employer model which states that the workers would be employed by the provider employees" (through conditions, perhaps, that do not obtain here). BWC Final Order at 4. Friendship's point that what's good for the governing and presumably law-abiding goose should be good for the subject gander, under the same rubrics, is left unanswered.

{¶ 25} Echoing the BWC's briefing, the magistrate's decision does note that "the evidence establishes that homecare providers * * * do not engage with the agencies in preparing the ISP." Magistrate's Decision at ¶ 56. True enough. The direct care providers do not undertake to do that: the particular service that they contract to provide relates not to the drafting of documents but to the care of disabled individuals in their homes *pursuant* to the ISPs that set the terms of what services are required. That they have had no hand in drafting the state-approved ISP is no evidence as to whether or not they are independent contractors in the role that they do undertake to perform. And again, the record reflects no evidence that the particular *manner and means* by which they undertake to satisfy the ISP and the customer are controlled by Friendship.

{¶ 26} The Magistrate's Decision next attempts to make something along the lines of the Friendship goose/gander argument in reverse. When one direct care provider chooses not to work, Friendship either turns to other such providers or fills a gap with one of its own employees: that, the magistrate posits, "demonstrates the interchangeability" of the direct care providers with workers Friendship concedes are "employees." *Id.* at ¶ 58. No, it doesn't. In fact, the comparison underscores a significant distinction: the record reflects that the direct care providers are free to pick and choose hours and assignments as they like, working no more than they like but with no guarantee of assignments or hours. The employees, by contrast, who have responsibilities other than and beyond filling in as

needed for direct care service gaps, have no such flexibility (they are "on call") and more stability.

{¶ 27} The Magistrate's Decision concludes in its next paragraph that: "While Friendship stressed before the commission that it did not monitor the homecare providers as they performed their tasks and executed the ISP, minute-by-minute supervision is not the test of oversight for these purposes." *Id.* at ¶ 59. We have no quarrel with that formulation: "minute-by-minute supervision" is not required to mark someone as an employee. But Friendship's "meeting with consumers on a regular basis to ensure that consumers are receiving appropriate services[,]" *id.*, does not go to the "key factual determination [of] who had the right to control the manner or means of doing the work," *see Bostic* at paragraph one of the syllabus: as we already have elaborated, " 'if the manner or means of doing the work or job is left to one who is responsible to the employer only for the result,' " employee status is not implicated, *see* BWC Final Order at 1 (quoting *Gillum*). Again, we are directed to no evidence that Friendship supervises " 'the means or manner of accomplishment,' " to use the words that *Gillum* quoted in establishing the law.

{¶ 28} Finally, in (properly) seeking to identify evidence in support of the BWC's determination, the Magistrate's Decision concludes that because the direct care providers invoice Friendship using an hourly rate, they "have no exposure to profit or loss and as such are essentially submitting a time sheet rather than a billing statement." Magistrate's Decision at ¶ 60. We agree that the record reflects that the direct care providers are paid by the hours they actually work (sometimes weekly, or every two weeks, "really at their discretion," Stip.R. at 48). In this specific context, where the undisputed record is that the workers must provide their own equipment, if any, are not reimbursed for most expenses, are not guaranteed hours of work, and are subject to having the client cancel the hours they planned to work, "without warning to anybody," (Stip.R. at 50)—and where the state has treated its own similarly situated workers as independent contractors—we do not find this to be evidence that Friendship exercises the relevant right of control. In the context of this matter, involving clients with potentially ongoing direct care needs, it is precisely *because* of the great flexibility and autonomy that the direct care providers have to elect their own days and hours of work that other systems of payment could be unwieldy.

{¶ 29} The balance of the magistrate's decision goes not to evidence that might support the BWC's decision but is directed to addressing various arguments put forward by Friendship. The decision is correct that providers who work part-time and irregular hours

need not for that reason alone be independent contractors. Even sporadic workers whose employers maintain control over the manner and means by which they perform their work may be employees. The case and paragraph the magistrate's decision cites, for example, pointed to evidence of the company manager's " 'presence on the jobsite' " (in addition to other evidence including company transport of workers from the employer's location to the worksite, the employer's provision of large equipment for the work, and other factors also not present in the case at hand). *State ex rel. Ohio Valley Selective Harvesting, L.L.C. v. Buehrer*, 10th Dist. No. 16AP-5, 2017-Ohio-369, ¶ 20, as cited by Magistrate's Decision at ¶ 61.

{¶ 30} The magistrate's decision is also correct to the extent that it notes that the signed agreements between Friendship and direct care providers designating the workers as independent contractors are not dispositive of the issue or binding on the BWC. We do not read the Magistrate's Decision to go so far as to suggest that such agreements should be of "no weight" to the finder of fact, *compare* Magistrate's Decision at ¶ 62 *with, e.g., Gillum,* 141 Ohio St., at 382 (referencing parties' mutual understanding as a potential consideration), and *Bostic*, 37 Ohio St.3d, at 146 ("any pertinent agreements or contracts" may be factors to consider), but rather to say that it is of no moment here given our standard of review looking only to whether there is evidence to support the BWC determination. Similarly, as explained above, we agree with the magistrate's decision that *Friendship* is not dispositive for our purposes (just as the 2006 or 2008 BWC auditor decision is not, and even as we recognize that a factfinder can take eligibility for unemployment compensation into account in such determinations, *see, e.g., Schaengold* at ¶ 20).

{¶ 31} Finally, the magistrate's decision counts as waived Friendship's argument that the BWC adjudicating committee did not hear the matter promptly enough, because "Friendship did not raise this issue before the designee." Magistrate's Decision at ¶ 63. Friendship poses a two-sentence objection to this conclusion, but provides us with no citation to the record or anything else to go on. Objections to Magistrate's Decision at 13. We overrule that objection.

{¶ 32} In its response to Friendship's other objections (relating to what the record reflects and, more globally, to the magistrate's conclusion that the BWC did not abuse its discretion in classifying the direct care workers as employees), the BWC argues at some length that the common law test as reflected in *Gillum* and *Bostic* applies to this matter.

Memorandum in Opposition to Objections at 2-5. That is correct: within the confines of the relevant standard of review, *Gillum* and *Bostic* control the analysis.

{¶ 33} The BWC's brief in opposition to the objections then essentially summarizes the magistrate's analysis that we have reviewed above. *Id.* at 6-9. The citations that the BWC provides in this section of its brief are exclusively to the magistrate's decision and do not independently refer to any other part of the record. *Id.* Thus, for example, the BWC cites that decision in support of its argument that "[t]here is no evidence any of [Friendship's] workers were certified by ODDD as an individual provider during the period under consideration," *id.* at 6, without responding to the record citations to the contrary provided by Friendship. *See* Objections at 5; Stip.R. at 56-57 (Hein testimony from August 18, 2015 that "I have some independent providers for the State of Ohio that work for me and also work for the state[, which] can afford to pay more quite frankly so they're a big competitor for us"); Stip.R. at 12. Repetition of the observation from the magistrate's Decision that the direct care providers "do not enter into a direct relationship [read, contractual relationship?] with the customer," Memorandum in Opposition to Objections at 6, is not evidence that Friendship exercises any right to control the manner and means by which the workers provide their services and does not distinguish this situation from any number of independent contractor scenarios. And emphasis on the point that Friendship direct care providers can "choose[] not to work for a given day" and that gaps are filled by Friendship employees who are not given that flexibility only further undermines the BWC's position. *See id.* at 7.

{¶ 34} In further rehearsing the magistrate's decision that we have parsed above, the BWC cites to no evidence on what *Bostic* reestablished as "the key" matter of who controls "the manner or means of doing the work." *See* 37 Ohio St.3d 144, 146 and paragraph one of the syllabus. BWC takes the passage from the magistrate's decision observing that "Friendship *supervises the quality of care* provided by the homecare providers, meeting with consumers on a regular basis to ensure that consumers are receiving the appropriate *services as reviewed* by supervisory staff," *see* magistrate's decision at ¶ 59 (emphasis added), to mean not that Friendship "supervises the quality of care provided," but rather that "[t]he magistrate found * * * Friendship-recognized employees supervise the other workers [something the magistrate's decision did not find, at least in those terms], *and* meet with consumers" to ensure that they are receiving what the employees deem appropriate services. Memorandum in Opposition to Objections at 7 (emphasis added).

But the BWC makes no effort to reconcile the actual record with what the BWC acknowledges the Supreme Court of Ohio said in *Gillum*, that "if the manner or means of doing the work or job is left to one who is responsible to the employer only for the result, an independent contractor relationship is thereby created." *See* BWC Memorandum in Opposition to Objections at 3 (quoting *Gillum*); BWC Brief at 19-20. Again, what counts here is " 'the right to control the person employed as to the details or method of doing the work,' " not " 'only * * * that the employer may see that the contract is carried out according to the plans.' " 141 Ohio St., at 382.

{¶ 35} We adopt paragraphs 37-48 of the magistrate's decision (modified herein as to ¶ 47) describing the BWC process that brought us to this stage. We sustain Friendship's objections to the magistrate's decision to the extent that the decision concluded that the BWC did not abuse its discretion in determining that the direct in-home care providers in question were not independent contractors during the relevant period. Finding that there was such an abuse of discretion, we grant the requested writ to the extent that we order the BWC to vacate its order finding that the in-home direct care providers were not independent contractors for the period assessed, and to return to Friendship any premium payments imposed or received as a result of that Final Order. For the years in question here and for later years, the BWC is not bound now or for all time by the results of its earlier audit or audits concluding that such workers were independent contractors, or by unadjudicated practices of the State of Ohio in also treating such workers as independent contractors, but on this record BWC lacks any evidence by which it could establish anything to the contrary for the years in question.

*Objections to Magistrate's Decision sustained in part;*
*writ granted as described.*

BEATTY BLUNT and MENTEL, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under the authority of the Ohio Constitution,
Article IV, Section 6(C).

_____

# A P P E N D I X

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel.,                                              :
Friendship Supported Living, Inc.,
                                                           :
        Relator,
                                                           :
v.                                                                    No.  19AP-882
                                                           :
Ohio Bureau of Workers' Compensation,                                (REGULAR CALENDAR)
                                                           :
        Respondent.
                                                           :

---

## M A G I S T R A T E ' S   D E C I S I O N

Rendered on July 23, 2021

---

*Law Office of Tracy L. Turner, LLC,* and *Tracy L. Turner* for relator.

*Dave Yost,* Attorney General, and *John R. Smart,* for respondent Ohio Bureau of Workers' Compensation.

---

IN MANDAMUS

{¶ 36} Relator, Friendship Supported Living, Inc. ("Friendship"), seeks a writ of mandamus ordering respondent, Ohio Bureau of Workers' Compensation ("BWC"), to vacate an order of the administrator's designee that determined that certain individuals are Friendship employees for purposes of workers' compensation coverage rather than independent contractors.

Findings of Fact:

{¶ 37} 1. Friendship is an Ohio corporation in the business of providing or coordinating in-homecare for persons with developmental disabilities under programs overseen by the State of Ohio Department of Developmental Disabilities ("ODDD") and the Franklin County Board of Developmental Disabilities ("FCBDD").  The recipients of these

services are referred to as "consumers" for purposes of care programs. The services provided are defined under an individual service plan ("ISP") developed by the state or county agency.

{¶ 38} 2. Friendship has participated in BWC's workers compensation system without lapse beginning November 4, 2003. (Stip. at 219.) Friendship included certain participants in its homecare services program as employees, particularly its health services coordinators. Friendship did not include its direct care workers, who provided the actual in-homecare and assistant to consumers, as employees and considered them independent contractors.

{¶ 39} 3. BWC notified Friendship that it would be conducting an audit of Friendship's payroll and business organization from the period July 1, 2014 to June 30, 2015. (Stip. at 7.) The audit report concluded that Friendship's homecare providers should be deemed employees for workers' compensation coverage purposes. The audit report concluded as follows:

> Based on the information provided the 1099's contractors are deemed as employees based on the following:
>
> Paid hourly; The W-2 staff also visits the same clients as the contractors to perform other related services including redetermination; Typically, the workers are interviewed, hired and paid set wages; They have their work assigned and scheduled (i.e. they are expected to be the client's between specific hours); The home health worker does not make decisions about the care or medication, exercise, etc.; they follow a plan developed by a healthcare provider and are overseen by a case manager or RN; The contract states that after 24 months they can apply to be an employee of friendship; Industry standards have some supervisor of the work that is performed by the home health aides; The contractors do not call to schedule any visits to the clients they serve. The company performs all scheduling of days and times when the contractor is to work; Worker's activities are monitored for compliance and quality; A worker could not hire someone to fill in – the services have to be performed by him/her personally; Timesheets are submitted and 1099 recipients do not invoice for their services. They are paid hourly, not by visit; The HHA cannot contract to another party to provide the services - he/she must perform the services personally; Liability insurance is carried by the employer; Services are integrated into the functioning of the employer who is in the business to provide home health.

{¶ 40} 4. The audit further described Friendship's operations as perceived by the auditor:

> The risk is a contractor that provides care services for individuals with disabilities in their homes. There are six individuals employed. One works performing in office clerical duties. This individual is also a corporate officer and reportable to manual 8810. There are five individuals that work at various homes assisting clients. This includes other duties that the contractors do not provide. This includes redetermination of individuals, scheduling doctor appointments along with transporting clients as needed. All are reportable to manual 8835.

(Stip. at 126.)

{¶ 41} 5. Friendship protested the audit and requested a hearing. (Stip. at 35.) BWC conducted the hearing before the adjudicating committee on December 5, 2017. (Stip. at 38.)

{¶ 42} 6. The adjudicating committee rendered an opinion mailed March 5, 2018 denying Friendship's protest and upholding the audit findings. (Stip. at 132.)

{¶ 43} 7. In support of its proceedings before BWC, Friendship submitted the affidavit of one of its principals, Jerry M. Hein. (Stip. at 1.) Hein described the process under which Friendship provided services to consumers as follows:

> [Four] The initial step in providing consumer services involves an interview by the consumer of three agencies approved by the Franklin County Board of MRDD. The consumer has the free choice of selection based upon the interviews. If the consumer selects Friendship Supported Living, Inc., Friendship Supported Living, Inc. determines whether there is an existing plan for the consumer or whether a new plan needs to be developed.
>
> [Five] The plan, an Individual Service Plan (ISP) is written by the Franklin County Board of MRDD and specifies items such as hours needed by the consumer, activities requested or needed by the consumer, such as doctor visits, visits to the bank, social activities, days per week and other items.
>
> * * *
>
> [Seven] The consumer is free to deviate, change or delete services as the consumer deems appropriate. For example, if a consumer has a family member run errands for the consumer or the family member or friend fixes a meal, the

consumer can tell the on-site independent contractor that the independent contractor is not needed on a particular day or is needed to perform other services. The consumer may also determine, for example, that a different independent contractor can be assigned. One woman customer, 72 years of age, is not comfortable with a younger independent contractor assisting her to shower and has requested an older independent contractor to help with the showering.

[Eight] The independent contractor is also free to discuss with the customer any changes in service. For example, if a customer requests to be taken to the zoo when the independent contractor arrives at the customer location, the independent contractor can advise the customer that the independent contractor cannot take the customer that day but can take the customer to the zoo on the next visit.

[Nine] Friendship Supported Living, Inc. does not supervise or in any way manage the services provided by the independent contractor on a particular day. There is no on-site supervision.

[Ten] Although Friendship Supported Living, Inc. does not monitor or manage the means or way that an independent contractor provides the ISP services on a particular day, Friendship Supported Living, Inc. does meet with the customer, not the independent contractor, on a regular basis to ensure that the customer is, for example, treated fairly, that sufficient groceries are at the residence, that the customer is taking medication as ordered, and that the appropriate activities have been provided.

[Eleven] The hours of service provided by independent contractors vary from day to day and from week to week and from independent contractor to independent contractor. Most of our independent contractors have second jobs, and 80% of the independent contractors work for another provider; that is, a competitor of Friendship Supported Living, Inc. The independent contractor is free to select the hours available as an independent business person and make individual choices concerning their income and the intangibles in providing contractual services. Some of our independent contractors attend school and contract with Friendship Supported Living, Inc. to accommodate their class schedules.

[Twelve] A customer can terminate the services of an independent contractor but cannot terminate one of our employees.

[Thirteen] Our employees, some of whom perform management services, perform different services than the independent contractors.

[Fourteen] The employees, not the independent contractors, attend ISP plan meetings with the representative of the Franklin County Board of MRDD. At least every twelve months the services are renegotiated. These plan meetings and redeterminations take approximately ten hours of time during each week for each of the employees.

[Fifteen] The employees, not the independent contractors, meet with representatives of Jobs and Family Services every six months for the application and processing and review of services provided under Ohio Medicare which covers such things as physician services, food stamps and dental services.

* * *

[Twenty-Three] The employees, not the independent contractors, are on call 24 hours a day and fill-in for independent contractors if the independent contractor does not show up on a given day.

[Twenty-Four] Because of business considerations, the employees, not the independent contractors, are provided with company cell phones.

* * *

[Twenty-Eight] The independent contractor relationship between the independent contractor and Friendship Supported Living, Inc. is intended to be short-term, as many independent contractors have second jobs or are enrolled in school. Most independent contractors are looking for short-term arrangements.

[Twenty-Nine] The general hours of service are initially set forth in the ISP plan subject to change by the consumer. The specific hours of service of the independent contractor are determined by the independent contractor. It is not an infrequent situation where the consumer cancels the services or reduces the hours on a particular day.

[Thirty] The independent contractor is not required to devote full time to Friendship Supported Living, Inc. As stated above, most independent contractors have second jobs and want flexibility in their schedules.

* * *

[Thirty-Two] The ISP (work order) is established by the Franklin County Board of MRDD not by Friendship Supported Living, Inc. and can be, and is in fact, changed by the consumer.

* * *

[Thirty-Four] No expenses of the independent contractors are paid by Friendship Supported Living, Inc. As stated above, mileage is reimbursed by the state to the independent contractor at the rate of $.30 per mile.

[Thirty-Five] Friendship Supported Living, Inc. does not furnish any tools or materials to the independent contractor.

* * *

[Forty] The services of the independent contractor are available to those member[s] o[f] the public who are in the same business as Friendship Supported Living, Inc. These services are regulated by the state, federal and local governments.

[Forty-One] Friendship Supported Living, Inc. has the right to terminate the independent contractor agreement, and there exists no liability on the part of the independent contractor upon such termination pursuant to any employment agreement.

[Forty-Two] The independent contractor is advised that the independent contractor [c]an obtain workers' compensation coverage through the Ohio Bureau of Workers' Compensation. Several of our independent contractors do, in fact, have Ohio workers' compensation coverage under their own policy.

[Forty-Three] The independent contractor executed an independent contractor agreement which has already been provided to the Ohio Bureau of Workers' Compensation.

[Forty-Four] The independent contractors have been furnished 1099 forms for all tax purposes.

[Forty-Five] The independent contractors are not provided any benefits, such as hospitalization, retirement, or vacation benefits, by Friendship Supported Living, Inc.

{¶ 44} 8. The adjudicating committee applied the common-law right-to-control test as set forth in *Gillum v. Indus. Comm.*, 141 Ohio St. 373 (1943), and based upon the findings of fact in the audit, reached the following conclusions:

> The Committee finds the direct care workers are in the service of Friendship Supported Living, rather than "independent contractors." Friendship Supported Living is certified by the Ohio Department of Developmental Disabilities ("ODDD") as a Home/Community Based Waiver Services provider homemaker/personal care services. The auditor pointed out ODDD recognizes two types of providers, independent and agency, and that Friendship Supported Living is an agency provider:
>
> An agency provider "means an entity that directly employs at least one person in addition to the chief executive officer for the purpose of providing services for which the entity must be certified in accordance with rule 5123:2-2-01 of the Administrative Code." Ohio Adm.Code 5123:2-9-06(B)(1). (emphasis added)
>
> An independent provider "means a self-employed person who provides services for which he or she must be certified in accordance with rule 5123:2-2-01 of the Administrative Code and does not employ, either directly or through contract, anyone else to provide the services."
>
> In this type of work, a person can be self-employed in the private sector. A person could also be an independent contractor by becoming a certified independent provider with the Ohio Department of Developmental Disabilities. However, here, it is Friendship Supported Living that is certified as an agency provider to employ people to provide the services for which Friendship Supported Living is paid to provide. Friendship Supported Living cannot provide these services without employees. When working for Friendship Supported Living the direct care workers are providing their personal labor in the normal course of Friendship Supported Living's business pursuit. The workers may not be full-time employees, but part-time employees and casual workers are employees under R.C. 4123.01(A)(1)(b). A casual worker is an individual whose work is occasional and not on a regular basis.
>
> The workers were misclassified as "independent contractors" by Friendship Supported Living. Friendship absolutely has the right to control how the services are provided under the authority it obtained from ODDD. Friendship Supported

Living maintains the required liability insurance and if one of the workers is unavailable to perform services it is Friendship Supported Living that has the obligation to arrange coverage. The assertion that "[n]o one at Friendship Supported Living supervises the direct care providers" is not accurate. Friendship Supported Living has employees that control the workers by monitoring their activities for compliance and quality. The fact the consumer and worker may mutually decide what they will do while the direct care worker is there has no bearing on if the worker is running their own business. The workers in this employment relationship have more autonomy and flexibility than in some employee/employer relationships. However, autonomy and flexibility is common for employees in his field and many other types of work.

The assertion that "the State of Ohio pays the wages" also is not accurate. ODDD pays Friendship Supported Living because they are the agency provider responsible for providing the services. Friendship Supported Living then compensates the workers utilizing straight-time pay (hourly wages), but issued an IRS Form 1099 instead of a W-2. An employee that is misclassified as an "independent contractor" typically is issued a 1099. A person does not become an "independent contractor" based on how the employer characterizes the relationship or by a worker acquiescing to an arrangement dictated by the employer. The underlying facts and true nature of the relationship speaks for itself.

The employer asserted a pervious audit determined the direct care workers were independent contractors. An auditor in 2006 did consider the 1099 workers as independent contractors. However, a 2008 audit did not consider the 1099 workers as independent contractors. The fact an auditor reached a different conclusion in 2006 has no bearing on the analysis of the facts and determination made by the current auditor. The employer did not comply with the audit findings in subsequent payroll reporting periods. Based on this, the auditor could have made the audit findings retrospective for a significant period, but did not.

{¶ 45} 9. Dissatisfied with the adjudicating committee's decision, Friendship requested a hearing before the administrator's designee. (Stip. at 133.)

{¶ 46} 10. The administrator's designee held hearing on April 16, 2019 and mailed the decision on November 26, 2019 upholding the adjudicating committee's order. (Stip. at 219.) The administrator's designee again applied the common-law right-to-control test to determine that Friendship's homecare givers were employees, not independent

contractors.  The administrator's designee specifically rejected application of the 20-part test of R.C. 4123.01(A)(1)(c) which applied only to construction workers in the workers' compensation system.  The administrator's designee made the following findings of fact and conclusions of law:

> After reviewing the testimony and evidence, the Administrator's Designee concludes that there is sufficient control by Friendship over the activities of the workers to conclude that the workers are employees of Friendship. The Administrator's Designee is not persuaded by the argument that the workers are not supervised by Friendship but rather have free rein in providing the care to the clients. The nature of the services provided by the workers, in the home of a client consumer, will of course provide some flexibility and freedom for the worker. That is the nature of the service at issue here. Friendship controls the workers by monitoring their activities for compliance and quality. The fact the consumer and worker may mutually decide activities does not mean that the worker is free from supervision or control. The workers have more autonomy and flexibility than in some work setting[s], but the autonomy and flexibility common for employees in this field does not equate to independent contractor status.
>
> Friendship argued that there is a Franklin County Court decision finding a worker to be an independent contractor for unemployment compensation reporting purposes. While the tests for an employer-employee relationship are similar for unemployment compensation and workers' compensation purposes, the Administrator's Designee finds that the Bureau's determination in this case that the workers are employees and not independent contractors is for the purpose of reporting Ohio workers' compensation payroll and premiums only, and this determination is not conclusive or binding on Friendship for other payroll reporting obligations, such as to the Internal Revenue Service for taxes or to the Ohio Department of Job and Family Services for unemployment compensation.

{¶ 47} 11.  More or less contemporaneously to the present proceedings before BWC, Friendship successfully challenged a similar determination by the Unemployment Compensation Board of Review, which had found the homecare providers to be employees for purposes of computing unemployment compensation payroll and risk. The Franklin County Court of Common Pleas ultimately reversed the board and held that the homecare providers were independent contractors for unemployment compensation purposes. *Friendship Supported Living, Inc. v. Ohio Dept. of Job and Family Serv.*, Franklin C.P. No.

15CVF-8721 (Mar. 7, 2016 Decision.) A transcript of the testimony of Florence Hein, a principal of Friendship, before the court of common pleas was later presented and accepted as evidence before the adjudicating committee in BWC proceedings. It essentially paralleled the affidavit evidence of Jerry Hein.

{¶ 48} 12. Friendship filed its complaint in mandamus in this court on December 30, 2019.

Discussion and Conclusions of Law:

{¶ 49} In order for this court to issue a writ of mandamus, a relator must show a clear legal right to the relief sought, a clear legal duty on the part of the respondent to provide such relief, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A right to a writ of mandamus exists when a designee's order constitutes an abuse of discretion because it is not supported by any evidence in the administrative record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76, 78-79 (1986), citing *State ex rel. Hutton v. Indus. Comm.*, 29 Ohio St.2d 9, 13 (1972); *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165, 167 (1981). The term "abuse of discretion" connotes more than an error of law. A reviewing court will only reverse a decision for an abuse of discretion if the decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Accordingly, this court will not disturb the administrative order if there is "some evidence" to support it. *State ex rel. Fiber-Lite Corp. v. Indus. Comm.*, 36 Ohio St.3d 202 (1988), syllabus; *State ex rel. Bennett v. Aldi, Inc.*, 10th Dist. No. 14AP-632, 2016-Ohio-83, ¶ 6.

{¶ 50} The central issue in this case is whether the administrator's designee abused his discretion in determining that Friendship's homecare providers were employees rather than independent contractors, thereby requiring Friendship to include compensation for such persons, until now excluded from payroll, for purposes of determining the appropriate premium for workers' compensation coverage in Ohio. Friendship also argues that BWC did not timely conduct proceedings to provide a hearing before the adjudicating committee.

{¶ 51} The magistrate concludes the designee did not abuse his discretion when applying the common-law test to determine whether these homecare providers were employees, and it is therefore the magistrate's decision for the reasons that follow that no writ issue in this case. The magistrate further finds that the timeliness of BWC proceedings was not raised before the designee and is waived.

**{¶ 52}** The threshold issue in determining whether workers are employees or independent contractors is the amount of control exercised by the putative employer over the manner and means of performing the work. *Gillum* at 373, 380-82. Whether a worker is an independent contractor or employee depends upon the facts of each case. The principal test applied to determine the character of the arrangement is that if the employer reserves the rights to control the manner or means of doing the work, the relation created is that of master and servant, while if the manner or means of doing the work or job is left to one who is responsible to the employer only for the result, an independent contractor relationship is thereby created.

**{¶ 53}** In determining the amount of control exercised over the alleged employee in order to determine his status, the Supreme Court of Ohio has set forth certain factors to be considered. These factors include such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools, and personnel used; who selects the routes traveled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts. *Bostic v. Connor*, 37 Ohio St.3d 144, 146 (1988); *Gillum* at 373.

**{¶ 54}** The adjudicating committee and designee in this case reviewed the evidence in detail and found the homecare providers were sufficiently controlled by Friendship to be employees rather than independent contractors. There is some evidence to support this conclusion and it is not contrary to law.

**{¶ 55}** Ohio Adm.Code 4123-17-17 empowers BWC to undertake audits of employer records to ascertain the correct premium paid for workers' compensation coverage. BWC has a duty to correct inaccuracies and payroll reporting by employers. Ohio Adm.Code 4123-17-28. One of the most pertinent facts underlined by the auditor and subsequent BWC review is that ODDD recognizes two types of providers, independent providers and agency providers. Friendship, according to its own principal's affidavit and all other evidence in the matter, is a certified agency provider. Friendship's homecare providers were not documented in this case as being individually certified to provide such care under ODDD programs.

**{¶ 56}** As the certified agency provider, Friendship negotiates the ISP with ODDD or FCBDD. The evidence establishes that homecare providers, despite their purported status as independent contractors, do not engage with the agencies in preparing the ISP.

{¶ 57} Although the consumers have a choice of certified agencies, and as a second step in the process may select or reject a proffered care worker if Friendship is the selected agency provider, Friendship offers a choice limited to its own workers and providers. Friendship's homecare providers cannot establish a care position with a Friendship consumer outside of the relationship agreement between the provider and Friendship.

{¶ 58} The agreement between the homecare providers and Friendship does not permit the purported independent contractor providing homecare under Friendship's contract and ISP to subcontract the work to another party; if a homecare provider chooses not to work for a given day where services are required, Friendship furnishes the replacement either from its currently recognized (for BWC payroll purposes) employees or another purported independent contractor. This demonstrates the interchangeability of Friendship's supervisory employees, already treated as employees for workers' compensation purposes, and the homecare providers that Friendship would prefer to treat as independent contractors.

{¶ 59} The evidence also establishes that Friendship supervises the quality of care provided by the homecare providers, meeting with consumers on a regular basis to ensure that consumers are receiving appropriate services as reviewed by supervisory staff. While Friendship stressed before the commission that it did not monitor the homecare providers as they performed their tasks and executed the ISP, minute-by-minute supervision is not the test of oversight for these purposes.

{¶ 60} The pay structure also supports the designee's conclusion. While Friendship prefers to consider that its homecare providers submit an invoice reflecting hours worked, the rate is set by Friendship at a fixed hourly rate. Employees have no exposure to profit or loss and as such are essentially submitting a time sheet rather than a billing statement.

{¶ 61} Friendship also attempts to interpose the fact that homecare providers work part-time and irregular hours. Employment is not limited to full-time workers in the Ohio workers' compensation system. Workers' compensation coverage is required for part-time and casual workers who meet the wage and other criteria of R.C. 4123.41. *State ex rel. Ohio Valley Selective Harvesting, L.L.C. v. Buehrer*, 10th Dist. No. 16AP-5, 2017-Ohio-369, ¶ 20.

{¶ 62} Finally, Friendship's own consistent but self-serving designation of the homecare providers as independent contractors is of no weight in this decision. The recent case of *State ex rel. Ugicom Ent. v. Morrison*, 10th Dist. No. 17AP-895, 2021-Ohio-1269, is

on point. In that case, we noted with approval cases decided under the Federal Fair Labor Standards Act: " 'It is well settled that the economic realities of an individual's working relationship with the employer—not necessarily the label or structure overlaying the relationship—determine whether the individual is an employee.' " *Ugicom* at 59, quoting *Acosta v. Jani-King of Oklahoma, Inc.,* 905 F.3d 1156, 1159-60 (10th Cir.2018). As in *Ugicom*, the BWC determination here reflects the economic reality and the closely controlled work performed by the employees, as well as the manifest employee-employer relationship for pay and general working conditions. *Ugicom* also makes clear that Friendship's reliance on rulings in unemployment compensation matters is misplaced. These are not determinative of employee status for workers' compensation coverage because the unemployment and workers' compensation systems rely on separate and independent administrative and statutory criteria. *Id.* at ¶ 12.

{¶ 63} Friendship also asserts the designee's order should be set aside because the adjudicating committee did not hear Friendship's appeal within 60 days, as purportedly required by R.C. 4123.291. BWC argues that R.C. 4123.291's time limit is directive, rather than mandatory, pursuant to *Schick v. Cincinnati*, 116 Ohio St. 16 (1927). The more dispositive question, however, is the fact that Friendship did not raise this issue before the designee. Issues that were not raised at the appropriate time in administrative proceedings cannot lead to a finding of an abuse of discretion in subsequent proceedings and cannot give rise to relief in mandamus. *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78 (1997).

{¶ 64} In summary, it is the magistrate's decision and recommendation the administrator's designee did not abuse his discretion in upholding the adjudicating committee's determination that the audit correctly established Friendship's homecare providers as employees rather than independent contractors, and no writ should issue in this case.


                                                                /S/ MAGISTRATE
                                                                MARTIN L. DAVIS


**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or

legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).